## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| **VICTORIA S. BOYLE,** | | |
| Plaintiff, | | |
| *v.* | | Case No. 1:22-cv-05803 |
| **ILLINOIS DEPARTMENT OF CORRECTIONS,** a state agency, | | COMPLAINT |
| Defendant. | | |

## COMPLAINT

1.      Plaintiff Victoria S. Boyle complains against the Illinois Department of Corrections ("IDOC"), a state agency, as follows:

### NATURE OF THE ACTION

2.      This case is about a principal at a men's prison school, Jeffrey P. Siegfried, grooming his subordinate, educator Victoria Boyle, to have a sexual relationship with him and subjecting her to daily harassment and sex discrimination. During the Covid-19 lockdown, Siegfried locked Ms. Boyle in a computer lab and repeatedly suggested they have sex in a closet. When Ms. Boyle refused, Siegfried asked if she were afraid that he would "force her into the closet and rape her" and threatened that he "could force" her to have sex with him. Siegfried also threatened her job and threatened to "no longer protect [her] from the things the inmates could do to [her]." Siegfried then ordered Ms. Boyle to stay in her classroom and changed her work duties so that she would be in closer contact with the adult male prisoners.

3.      This case is also about how IDOC botched its response to Ms. Boyle's prompt reporting of Siegfried's sexual harassment. IDOC violated its own directives by (1) declining to open a formal investigation into Ms. Boyle's allegations; and (2) removing the alleged victim from

her duties as opposed to removing the alleged perpetrator. IDOC's deviation from state policy meant that Ms. Boyle was demoted to the mail room where she had to open mail for prisoners, much of it pornographic, instead of performing her educator duties. IDOC did nothing to discipline Siegfried for nearly two years, during which time he sexually harassed another employee.

4.      This case is also about how IDOC treated Ms. Boyle as an inconvenience and did nothing to accommodate her emotional distress or to repair the harm Siegfried had caused. IDOC offered her no resources or counseling and revoked its prior approval of her Benefit Time so she could not take a paid leave of absence to recover from the assault. Because Siegfried was still her supervisor, Ms. Boyle sought a hardship transfer to another facility and a change in her start time, accommodations that were denied. When Ms. Boyle complained to IDOC about the discrimination and retaliation she had endured, she was brushed off.

5.      IDOC intentionally sexually harassed Ms. Boyle, and discriminated and retaliated against her in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §2000*e et seq*. ("Title VII").

**THE PARTIES**

6.      Plaintiff Victoria S. Boyle is a citizen of Illinois and a resident of Princeton, Bureau County, Illinois.

7.      Defendant IDOC is a department of the State of Illinois government that operates the adult state prison system, including Sheridan. It employs over 500 people and conducts business throughout Illinois.

8.      IDOC's headquarters is located at 555 W. Monroe St., 6th Floor, Chicago, Cook County, Illinois, 60661.

2

## JURISDICTION AND VENUE

9.      The Court may exercise subject-matter jurisdiction over this action because Plaintiff's Title VII claim arises under the laws of the United States. 28 U.S.C. §§ 1331, 1343(a)(3), and 42 U.S.C. § 1988.

10.      Defendant IDOC is headquartered in this judicial district, and conducts business in this judicial district.

11.      Venue is appropriate in this judicial district as the events giving rise to the action occurred here and the parties are residents of this judicial district. 28 U.S.C. §§ 1391(b)(1)-(2).

12.      On January 9, 2021, Plaintiff timely filed Charges of Discrimination against both Defendant with the Illinois Department of Human Rights ("IDHR") and U.S. Equal Employment Opportunity Commission ("EEOC") alleging sexual harassment, harassment, hostile work environment, sex discrimination, and retaliation against Defendant IDOC and Siegfried.

13.      On April 15, 2021, Plaintiff filed a Complaint in the Circuit Court of the Thirteenth Judicial Circuit against Siegfried alleging common law battery, assault, false imprisonment, intentional infliction of emotional distress, and violation of the Illinois Gender Violence Act.

14.      On or about August 25, 2022, the IDHR issued an Order of Administrative Dismissal on Plaintiff's charge of discrimination against Siegfried because Ms. Boyle had initiated litigation already.

15.      On or about September 14, 2022, the IDHR issued a Notice of Substantial Evidence on all counts of Plaintiff's charge of discrimination against Defendant IDOC.

16.      On or about September 20, 2022, Plaintiff requested that the EEOC adopt the findings of the IDHR and issue a notice of right to sue.

17.      Plaintiff has exhausted her administrative remedies.

18.     On October 17, 2022, Plaintiff filed her First Amended Complaint in the Thirteenth Judicial Circuit alleging claims against Siegfried and Defendant IDOC under the Illinois Human Rights Act ("IHRA"). Because these violations were committed willfully, Plaintiff sought compensatory, actual, and exemplary damages, in addition to attorney's fees and costs.

## RELEVANT FACTS FOR ALL COUNTS

19.     From August 19, 2019, to the present, Ms. Boyle has worked as an educator at Sheridan Correctional Center ("Sheridan"), a medium-security state prison for men located in Sheridan, LaSalle County, Illinois.

20.     Ms. Boyle received her teaching certificate in 2011, and taught mathematics at Bureau Valley High School for several years. She accrued 93.5 sick days there that were carried over to Sheridan and approved by Sheridan's HR ("Benefit Time").

21.     For the first six months of her employment she was on probationary status.

22.     When Ms. Boyle started as an educator at Sheridan, she was 30 years old and in the process of obtaining a divorce.

23.     Siegfried received his teaching certificate in 2001. He had been a high school teacher and coach prior to becoming an educator at IDOC on August 8, 2005. In 2019, he was about 50 years old and had been married almost 20 years.

24.     In June 2018, Siegfried transferred from Illinois Youth Center-Warrenville to Sheridan.

25.     Around January 2019 Siegfried took a position as the temporarily assigned Education Facility Administrator ("EFA") at Sheridan. He did not receive any formal training when he assumed this supervisory role.

26.     Siegfried was Ms. Boyle's immediate supervisor.

4

27.     Siegfried was responsible for approving educators' benefit time, setting schedules, assigning duties, conducting performance reviews, and administering any discipline, including termination.

28.     At all times, Ms. Boyle performed her work well and met or exceeded her employer's expectations.

29.     Ms. Boyle had no record of discipline or any other performance issues.

**Siegfried isolates Ms. Boyle and closely controls her every move at Sheridan.**

30.     On her first day at Sheridan, Ms. Boyle asked HR about taking time off in mid-November 2019 for a mission trip to Uganda that she had previously committed to. HR told her to talk to her supervisor, Siegfried, for approval.

31.     Siegfried advised her that she should not take time off while a probationary employee, implying that it would jeopardize her job. Siegfried told Ms. Boyle to be quiet about it and that he would arrange it so her time off would be approved.

32.     Siegfried immediately took an interest in Ms. Boyle.

33.     He isolated Ms. Boyle from coworkers. For example, on the second day of work, she went for a walk at lunch time with coworkers. When she returned, Siegfried threatened in an aggressive manner to discipline her for not signing out. After that, she did not walk with her coworkers.

34.     Siegfried closely controlled when and where Ms. Boyle performed her duties, although he did not closely control when other educators performed their duties.

35.     He resisted assigning Ms. Boyle teaching duties, which would have put her in contact with the adult male prisoners, and kept her in training longer than the standard period.

36.     Siegfried told Ms. Boyle that another educator was going to stalk her and so she should park in the same parking lot as him. He instructed her to arrive at the same time as him every day so they could walk in and out of the Academic Building together.

37.     Ms. Boyle did as Siegfried instructed and parked in the same parking lot and arrived at the same time as him. At one point, she tried to get some distance from him by parking in another lot and he texted "Classy move, have a nice safe week."

38.     Siegfried exercised complete control over Ms. Boyle's employment.

39.     He frequently issued "direct orders" and demanded that she comply with his orders.

40.     Siegfried frequently told her stories about his using physical violence to get what he wanted. For instance, he claimed that he beat up a man who had been harassing Siegfried's college girlfriend, and showed Ms. Boyle his bruised hand. On more than one occasion, he claimed that he had physically assaulted someone in Amboy, Illinois, using weapons in the trunk of his car.

41.     Siegfried put Ms. Boyle in constant fear for her job by claiming that he could train a monkey to do her job and berating her for any minor mistakes.

**Siegfried acts like a teenager with a crush on Ms. Boyle and uses his power over her to command her attention.**

42.     Siegfried consistently used inappropriate language and made Ms. Boyle feel uncomfortable by discussing salacious personal details and confidential medical information about her coworkers.

43.     He related stories that emphasized his sexual and physical prowess and highlighted his alleged desirability to women. Siegfried also claimed he had influence with IDOC administrators and "had a guy" in Springfield.

44.     If Ms. Boyle were not paying sufficient attention to Siegfried's non-work-related stories, he would complain that she was not "all in." Ms. Boyle understood this comment to be an implicit threat to her employment.

45.     Siegfried asked Ms. Boyle probing questions about her personal life, and pushed her to discuss her pending divorce and past relationships. He asked if she had ever cheated or fantasized about cheating on her husband. Ms. Boyle found his questions inappropriate and they made her feel uncomfortable. When she refused to talk about her personal life, he instructed her to be "all in" on their "friendship."

46.     Siegfried disliked Ms. Boyle's refusal to talk about topics that made her uncomfortable. On March 26, 2020, he ordered Ms. Boyle to sign a note promising that "all conversations will have a start and end after all has been said. No ending in the middle."

47.     Siegfried verbally said, "I love you," to Ms. Boyle before she left on her mission trip. When she told him that was weird and made her uncomfortable, he claimed that he said "I love you" to his friends every day and that love wasn't a "dirty word."

48.     Siegfried nicknamed Ms. Boyle "Seabiscuit" and gave her a copy of the movie "Seabiscuit" in addition to many other gifts, including an Amazon gift card, a magic book, a deck of cards he valued at $300, a sweatshirt, a travel journal, a travel bag, and a draw-string bag. He made a large donation to her mission-trip fundraiser; handwrote her lyrics to a song from a musical, and wrote her long, expressive cards for her birthday, Christmas, and thank-you cards.

49.     Siegfried invited her on at least four trips out of state because she was a "small town girl" and he wanted "to show her the world." Siegfried extended an open invitation to Las Vegas, where he promised to introduce her to his "friend," the magician, Penn Jillette. Ms. Boyle declined all Siegfried's invitations to join him on trips.

7

50.     Siegfried offered Ms. Boyle and her boyfriend, whom Siegfried dubbed her "pookie num-num," tickets he had won to a Ricky Lee Jones concert at the Rialto Theater in Joliet, Illinois, on October 22, 2019, because he allegedly couldn't go.

51.     When Ms. Boyle accepted the tickets and went to the concert with her boyfriend, Siegfried was hurt. Siegfried complained to Ms. Boyle that she should have invited him to the concert, and he had arranged a tour around the theater for them and planned for them to have expensive wine at his friend Johnny's home and then a meal at his favorite restaurant. Siegfried then claimed his friend Johnny was "so disappointed" and didn't like Ms. Boyle because she was not living her life "all in," which "wasn't a way to live life."

52.     In October 2019, while they were alone in the office at Sheridan, Siegfried ordered Ms. Boyle to pull her chair close to his, to take his hand, and close her eyes. Ms. Boyle said that made her uncomfortable and Siegfried ordered her to "trust him." He instructed her to take deep breaths and think happy thoughts, that he would count to five and then let go. Ms. Boyle felt creeped out and just wanted it to be over.

53.     Siegfried would comment on Ms. Boyle's hair styles and would suggest she had a "rough night" if she wore her glasses, to the extent that Ms. Boyle avoided wearing her glasses and styling her hair.

54.     Approximately 75% of the time Siegfried walked by Ms. Boyle he would squeeze her shoulder or pat/rub her hair. Siegfried would constantly attempt to bounce paper clips and rubber bands off of her breasts and body. Then he would tell her to pick them up so he could see her bent over.

55.     Ms. Boyle was afraid that Siegfried would fire her if she said "no" to him.

8

56. One day, Ms. Boyle commented that she had knee pain. Siegfried brought her a painkiller in her classroom and urged her to take it. Ms. Boyle refused. Siegfried said if she decided to, he wanted to be around in case she had a "bad reaction."

57. When they were alone, he hugged her and held on to hugs after she let go. In November 2019, Siegfried surprised Ms. Boyle by directing her to her classroom closet – where they could not be seen – and hugging her.

**Siegfried assigns Ms. Boyle work to maximize his time with her.**

58. In November 2019, Siegfried assigned Ms. Boyle to take over administering the Test of Adult Basic Education ("TABE"), which had been administered by Rob Boers, another educator at Sheridan.

59. At the time, Siegfried claimed the change was because Boers had lost track of a folder of TABE materials. When the folder turned up shortly after Ms. Boyle took over the TABE duties, Boers accused Siegfried of having hidden it.

60. Administering the TABE meant that Ms. Boyle had more time to spend in the office with Siegfried and less time teaching prisoners in her classroom.

61. Siegfried routinely had Ms. Boyle help him with his duties, requiring that she spend even more time in the office and not her classroom.

62. On or about November 3, 2019, Siegfried arranged a field trip for him and Ms. Boyle to visit Stateville Correctional Center, a maximum-security prison in Will County, Illinois.

63. While Siegfried was driving them alone in his car back to Stateville after lunch, he attempted to hold Ms. Boyle's hand. She drew her hand away. In response, Siegfried complained that Ms. Boyle made him "feel like scum" and he was "just doing it out of friendship to show her that she had grown."

64.     Later, Siegfried called Ms. Boyle on her cell phone to complain about how her drawing her hand away had "made him feel like scum."

**Siegfried's inappropriate text messages with Ms. Boyle while she was overseas.**

65.     During Ms. Boyle's mission trip to Uganda, from roughly November 4, 2019, to November 17, 2019, Siegfried sent Ms. Boyle hundreds of text messages via WhatsApp, many of them late at night his time, talking about his feelings and attempting to coerce a similar response from her.

66.     During her time in Uganda, Ms. Boyle was jetlagged and suffering from a virus.

67.     Ms. Boyle did not want to be texting with Siegfried, but she feared that if she displeased him, he would retaliate against her.

68.     In these text messages, Siegfried complained about how rejected he felt by her and excoriated her for not being "all in" on their relationship.

69.     Siegfried claimed that Ms. Boyle's refusing to hold his hand was: "Fucking hurtful. Fucking devastating. Fucking tear-inducing. Pretty fucking horrible for one moment."

70.     On November 8, 2019 at 12:56 a.m. CST, Siegfried wrote, "I express the deepest feelings only to hear deafening silence and indifference in return…"

71.     He continued, "You have the position you want and deserve at work now, and you'll be great. But you have to decide, and then, either way, give yourself no excuses […] if you are in, it's all in, with no crutches, no excuses, no lemming-jibberish; there will be pure joy, sharing caring… love."

72.     Siegfried added, "[T]here will be sunrises and sunsets," and "mysterious paths to be shared, explored and discovered – together."

73.     Ms. Boyle was jetlagged, sick, and confused. She felt pressured to reciprocate Siegfried's sentiments in the text exchange lest she face negative repercussions at work. Any time Ms. Boyle's responses showed hesitation or uncertainty, Siegfried would accuse her of "trampling" and "devastating" him. Because she just wanted him to leave her alone, Ms. Boyle affirmed that she was "all in" and expressed some of the affection he demanded.

74.     On November 8, 2019, at 1:04 a.m. CST, Siegfried texted, "I love you."

75.     Later that day, he wrote "Please know that I miss you … Please know that I'm thinking of you . . . Please know that I love you."

76.     On November 11, 2019, Siegfried wrote to her, "Btw, made a couple calls and had Dorothy [Nelson-Peterson] send a couple emails … you now officially have 3 weeks vacation … meant to tell you before … more good for YOU!!"

77.     In multiple texts, Siegfried pushed her to move their relationship forward and berated her for not doing enough to do so. He wrote, "But it needs to move. Forward. Every day in some way . . . down this unknown, scary, glorious wonderful road. Always forward. With you. Are you in? All in?"

78.     Siegfried added, "If you've been made to feel pressured, I'm sorry. But can I ask, have you done anything for me concerning how I feel?"

79.     Siegfried exclaimed: "You know enough about my life... do you think I was remotely looking for this? Few things knock me off my square, and you/this did/does..."

80.     Siegfried ordered: "Say something. And feel/mean it." When Ms. Boyle wrote that she didn't know what to say, Siegfried demanded she say "I love you." Then he asked, "Is that really a struggle? Every day we need to share that, ok? Every day we need to show that in some way, ok? EVERY DAY we need to celebrate this, ok?"

81.     On November 16, 2019, Siegfried instructed her to "avoid staff" on her first day back because there would be "a lot of chirping" and "there will be a ton of talk with the testing change [TABE assignment], too."

82.     When Ms. Boyle asked if she should be concerned, Siegfried texted her: "You know the issues with the situation, and what's been done to keep it ok ... Extended absence gets noticed, and people talk - all over ... then I hear about it. You take care of your end ... and just lay low and tell people nothing right now."

83.     Siegfried did not exchange text messages with other educators about sunsets or sunrises, love, being "all in," his trampled feelings, being "knocked off his square" by them, exploring mysterious paths, or "laying low" because of taking time off.

84.     Siegfried's messages were manipulative, harassing, and deeply inappropriate.

85.     Ms. Boyle traveled home from Uganda on or about November 17, 2019. She never again expressed affection toward Siegfried either verbally or in writing.

86.     A few days later, Siegfried reviewed Ms. Boyle's performance and found that it met or exceeded all expectations.

**Siegfried offers unsolicited favors and gifts, and interferes with Ms. Boyle's personal life.**

87.     On January 18, 2020, Siegfried texted Ms. Boyle: "If you need anything today/tonight, I promise to take care of it . . . don't want you frumpier than the frumpy I am provided with every day." He also called her "Frumpenstein."

88.     Siegfried routinely texted Ms. Boyle "good night" and asked how she was doing.

89.     On February 18, 2020, Siegfried made her write a note promising to leave her boyfriend if he didn't appreciate her.

90. Around that time, Siegfried told Ms. Boyle that her Benefit Time was being looked into, but he would ignore it and it would go away.

91. On or about March 14, 2020, Siegfried called a bakery to order chocolate-covered strawberries as a surprise for Ms. Boyle's birthday. He also wrote her a lengthy note in a birthday card that said: "[F]or what I am most deeply grateful is the amazing good fortune I have had these last 6+ months to share space with you every day." He continued, "[N]o day has been luckier than the one when you finally found your way to our little armpit of the world."

**Covid-19 Lockdown at Sheridan.**

92. In March 2020, IDOC implemented Administrative Quarantine to restrict the movement of prisoners and staff within a facility to mitigate the Covid-19 pandemic.

93. Education of prisoners at Sheridan was suspended for several months in 2020.

94. Educators started cleaning their own classrooms using supplies from the Costix closet, which only Siegfried had a key to.

95. On April 8, 2020, Ms. Boyle submitted a Notice of Absence to take off April 10th and April 16th. In response, Siegfried emailed Ms. Boyle two words: "In here."

96. Siegfried berated Ms. Boyle for wanting to take off two Fridays because Fridays were the busiest days of the week. He said that April 16th was his birthday and he thought Ms. Boyle should have remembered and made a point to be present for it. Ms. Boyle cried and Siegfried claimed he was joking.

97. Later, Ms. Boyle heard Siegfried loudly talking on the phone to Lauren Knutson, the clinical services supervisor at Sheridan, impugning Ms. Boyle's reliability.

**Siegfried capitalizes on the Covid-19 lockdown to proposition Ms. Boyle.**

98.     On April 9, 2020, Heather Heelan, a Sheridan corrections officer, took a temporary assignment as a Library Associate in the Academic Building reporting to Siegfried and the Librarian. Siegfried took an immediate interest in Ms. Heelan.

99.     When Ms. Boyle returned to work on April 13, 2020, Siegfried lavishly praised Ms. Heelan to Ms. Boyle, saying he had spent five hours with her on April 10 and she had really stepped up and did things that weren't her duties. To show his appreciation, Siegfried had given Ms. Heelan a Starbucks gift card.

100.    Siegfried asked Ms. Boyle why Ms. Heelan was dating Steve Fanti, another corrections officer, because he felt that Ms. Heelan was more attractive than Mr. Fanti. When Siegfried made a sexual remark about Ms. Heelan, Ms. Boyle rebuked him: "Well, that's inappropriate and Steve wouldn't appreciate it." Siegfried replied, "I'm not worried about Steve, I could take him anytime."

101.    Around 8:30 a.m. on April 13, 2020, Siegfried told Ms. Boyle that the parameters of "all in" were now going to change. Siegfried said to Ms. Boyle that she no longer would be willing to be "all in" because all limitations would be gone.

102.    Ms. Boyle told Siegfried that she did not know what he meant by that. Siegfried told her that he needed to go work in the computer lab and they could continue the conversation there about being "all in with no parameters."

103.    In the computer lab, Siegfried asked Ms. Boyle if she were "all in with no parameters?" Ms. Boyle said again that she didn't understand what he meant by that.

104.    Siegfried then looked Ms. Boyle straight in the eyes and said, "You know exactly what that means, Tori. You are not stupid."

105.    Siegfried then explained "all in" now included "more, everything." He added, "'All in' means locking the computer lab door and the two of us going into the closet with a chair."

106.    Ms. Boyle was shocked, scared, and very uncomfortable. She asked Siegfried how he could even suggest that because he had always assured her that he was her friend and that she could trust him.

107.    Siegfried said something to the effect of: "I never really thought about cheating on my wife before, but now that I have, there is nothing wrong with it. That something spectacular outweighs my word and vows. When a special connection is found then it should be taken advantage of. Why not have a spectacular eight hours together at work, because that could make our lives outside of work better?"

108.    Siegfried told Ms. Boyle that the Covid-19 lockdown was the perfect opportunity because there were only a few employees in the Academic Building and that no one would be looking for them. "If you are 'all in' then take my keys, go lock the door and take a chair into the closet," he said.

109.    Ms. Boyle refused to do any of that. She said, "I'm not locking the door," and "I'm not comfortable with your new definition of 'all in.'"

110.    Siegfried retorted, "You might as well leave, if you aren't 'all in.'" Ms. Boyle then left the computer lab. She understood that Siegfried was threatening her employment.

111.    At 4:54 p.m. that afternoon, Siegfried sent a text message to Ms. Boyle: "Figured I wouldn't hear from you, so it makes this easier . . . I hate texting. So . . . I had a chance to do some serious thinking, realizing and reality-checking . . . Will need to do some geographical separating. It's really all very good. There's no need for coordinated entries or lots."

112.    Ms. Boyle did not respond.

15

**Siegfried retaliates by changing Ms. Boyle's duties on April 14, 2020.**

113.     On April 14, 2020, Siegfried wrote a memorandum to Ms. Boyle, changing her duties from primarily administering the TABE to prisoners to only administering the TABE six days a month and teaching prisoners the remaining time.

114.     Later, Ms. Boyle observed Siegfried hand his keys to Melissa Werner, another educator and his close friend. Ms. Werner later opened the Costix closet so Ms. Boyle could use supplies to clean her classroom.

**Siegfried imprisons Ms. Boyle in the computer lab and threatens to rape her.**

115.     On April 15, 2020, Siegfried ordered Ms. Boyle to sign the memorandum that changed her duties. He said that she should limit her time in the communal office to five minutes a day and to stay in her classroom. Siegfried said that he shouldn't have to hardly see her during his last five years at Sheridan before he retired.

116.     Siegfried did not limit other educators to five minutes per day in the communal office space and order them to stay in their classrooms.

117.     Siegfried threatened to write up Ms. Boyle if she ever took cleaning supplies out of the Costix closet again without his permission. He then exited the office and slammed the door.

118.     Siegfried did not threaten to discipline other educators who took cleaning supplies out of the Costix closet to clean the rooms during the Covid-19 pandemic.

119.     Siegfried returned to the office and ordered Ms. Boyle to finish, return to her classroom, and stay there.

120.     Ms. Boyle pointed out that it wasn't fair for him to treat her that way simply because she refused to go into the closet with him.

121.    Siegfried raised his middle finger at her and said, "Fuck off." Siegfried added, "You have closed too many doors and there is no going back." Siegfried darkly warned that Ms. Boyle had made her choices, things were being set in motion, and she would have to live with the consequences.

122.    Siegfried said he had seen something "so special" in Ms. Boyle, but she was a great disappointment. He suggested they go to the computer lab to finish the discussion.

123.    Once inside the computer lab, Siegfried locked the door, locking the two of them alone. Ms. Boyle did not have keys to the computer lab and it was never locked when people were inside.

124.    Siegfried said that he had thought Ms. Boyle would be "all in" and be the person to "fill his void," and it wasn't a coincidence that they were both brought to Sheridan.

125.    Siegfried told Ms. Boyle that his friends would be happy if they had "those relations" even if it only stayed at work and if it went outside of work, then her parents would "just love him." Siegfried told Ms. Boyle that she had "made the wrong choice," and he would treat her better than the "scum" and "lemmings" in her life.

126.    Again, Siegfried instructed Ms. Boyle that if she wanted to be "all in" then she should "wheel a chair into the closet." Siegfried claimed he is "spectacular at that." Ms. Boyle understood "that" meant "sex."

127.    Again, Ms. Boyle told Siegfried that she was uncomfortable, didn't want that, and could never betray her boyfriend. Ms. Boyle questioned how Siegfried had gotten to this point when Siegfried had always assured her that he was a friend, that he was trying to protect and help her, and that he would never hurt her.

128.     Around this time, Pawneaul Jackson, another educator, came to the door of the computer lab to let them know lunch had arrived. Ms. Boyle saw Siegfried unlock the door.

129.     Ms. Boyle left the computer lab, locked herself in her classroom and sat back by her closet for her lunch break. She was terrified by what had just happened.

130.     At approximately 1:00 p.m. Ms. Boyle was working back near her closet area when she heard an extremely loud smack on her classroom door, which made her jump. She went to see the source of the noise and saw Siegfried waiting at the computer lab door, expecting her to follow him.

131.     Ms. Boyle saw Siegfried lock the door to the computer lab after she entered and place the key in his pocket. Only Siegfried had keys to the computer lab.

132.     After turning a computer on, Siegfried advanced on the desk area where Ms. Boyle stood. Siegfried is about 6 feet 4 inches tall. He towers above Ms. Boyle who is 5 feet tall.

133.     Siegfried said other things could be "turned on" besides computers. Ms. Boyle said that made her uncomfortable. Siegfried responded, "That doesn't mean I was going to take you in there and just bang you. Your clothes would have stayed on and so would mine."

134.     Siegfried said that the pandemic had given them the perfect opportunity for this to happen and that no one else needed to know. Ms. Boyle told Siegfried that she was uncomfortable and scared.

135.     Siegfried then asked Ms. Boyle, "Do you think I'm going to force you in the closet and rape you?"

136.     Siegfried threatened, "I could force you into the closet if I really wanted to … but I would never do that."

137.     Ms. Boyle was terrified that he was going to rape her.

18

138.    Siegfried then commented on "how quickly I could make your eyes roll backwards and make you let loose of everything" and "that was what you really needed."

139.    Ms. Boyle again told Siegfried that she was uncomfortable and asked to be let out of the room.

140.    Rob Boers came to the door and found it locked. Siegfried unlocked the door and Boers entered.

141.    At the end of the day, Siegfried said, "You picked the wrong path with me, which has set things in motion. I put you in your TABE position to help protect you from the things the inmates could do to you. I am done protecting you and associating myself with you. Good luck."

142.    On April 17, 2020, Ms. Boyle called off sick.

**Ms. Boyle reports Siegfried's sexual harassment to IDOC and is met with indifference.**

143.    On April 20, 2020, Ms. Boyle reported Siegfried's ongoing harassment, sexual harassment, and sex discrimination to Nicolette Duffield ("Assistant Warden Duffield"), Sheridan's Assistant Warden of Programs. Ms. Boyle submitted multiple incident reports detailing months of creepy behavior and sexual harassment.

144.    Assistant Warden Duffield consulted with Fernando Chavarria, administrator of IDOC's Office of Affirmative Action ("OAA"), Marcus Hardy, deputy director ("Director Hardy"), Natalie Northern, public service administrator, and Rich Stempinski, Siegfried's supervisor, about how to respond.

145.    IDOC determined that the complaints should be referred to OAA for investigation, and Siegfried and Ms. Boyle should be separated.

146. IDOC decided to keep Siegfried working as the EFA in the Academic Building, but remove Ms. Boyle from her educator duties and assign her to the mail room in the Administrative Building.

147. Ms. Boyle's new duties involved reading and sorting prisoners' mail, which often contained sexual, pornographic, and objectionable content.

148. On April 20, 2020, Assistant Warden Duffield called Siegfried and told him there had been some type of complaint and not to go into the Administrative Building.

149. On April 21, 2020, Ms. Boyle reported Siegfried's sexual harassment to the Office of the Executive Inspector General of the State of Illinois ("OEIG"). The OEIG launched an investigation.

150. Meanwhile, at the OAA, Martha Fragozo was assigned to review Ms. Boyle's report. After interviewing Ms. Boyle, Ms. Fragozo advocated to open a formal investigation, but Chavarria refused. Chavarria required that there be "witnesses to the relevant conduct."

151. Ms. Boyle's incident reports had identified several witnesses, including Siegfried, Rob Boers, Pawneaul Jackson, and Lauren Knutson.

152. The OAA did not interview any of Ms. Boyle's witnesses.

153. The OAA was supposed to follow the Office of the Governor's Guidance on Conducting Sexual Harassment Investigations ("Guidance") in determining whether to open a formal investigation.

154. The Guidance specifically instructed state agencies *not* to require eyewitnesses or corroboration in deciding whether to open a formal investigation.

155. The OAA did not follow the Guidance and did not open a formal investigation.

156.     On April 24, 2020, Chavarria wrote Ms. Boyle that the investigation had been completed and IDOC could not substantiate her allegations. IDOC referred the matter to its Investigations and Intelligence Division ("IID") for review.

157.     The IID interviewed Ms. Boyle and Siegfried separately on or about July 23, 2020, for an hour each. The interview focused solely on the events of April 2020. The IID did not request any documents or electronic communications.

158.     The IID concluded that the allegations could not be substantiated because of a lack of witnesses.

159.     IDOC took no disciplinary action against Siegfried.

**IDOC exacerbates Ms. Boyle's injuries by reassigning her, revoking her approved Benefit Time, and treating her differently than employees who did not report harassment.**

160.     On or about April 20, 2020, Assistant Warden Duffield gave Ms. Boyle permission to use her accrued sick leave to take a leave of absence.

161.     Ms. Boyle submitted the necessary paperwork and IDOC approved a 30-day leave of absence on April 27, 2020.

162.     On April 28, 2020, Sheridan's HR department told Ms. Boyle that her Benefit Time should not have carried over from her previous employment. HR told her that she now had negative one sick day and would need to use dock time for her leave of absence.

163.     Ms. Boyle could not afford to be on unpaid leave, and so she obtained a release to return to work from her doctor.

164.     On April 29, 2020, Ms. Boyle returned to Sheridan and started working in the mail room in the Administrative Building.

165.     No one trained her, no one offered her any reasonable accommodation, and no one ever reached out to check on her welfare.

21

166.    Assistant Warden Duffield denied Ms. Boyle's request to shift her hours to begin work one hour earlier so that her start and end times would not overlap with Siegfried's. She had already started parking in a different lot to avoid Siegfried.

167.    On June 16, 2020, a new warden, Sherwin Miles ("Warden Miles"), arrived at Sheridan.

168.    In mid-July 2020, Warden Miles asked Assistant Warden Duffield to explain why Ms. Boyle, an educator, was not performing educator duties.

169.    On July 27, 2020, Warden Miles ordered Ms. Boyle to return to her educator duties, although her worksite would remain in the Administrative Building, not in the Academic Building where Siegfried was. Ms. Boyle told Warden Miles that she was not comfortable going into the Academic Building alone if there were any chance that she could run into Siegfried.

170.    Afraid of interacting with Siegfried, Ms. Boyle asked her union president for a hardship transfer, and was told "those are no longer a thing."

171.    In mid-October 2020, after the IID investigation closed, Warden Miles sought and received permission from Director Hardy to return Ms. Boyle to the Academic Building.

172.    IDOC's only plan to ensure Ms. Boyle's safety was to provide Ms. Boyle and Siegfried a copy of IDOC's Administrative Directive on sexual harassment to sign. Director Hardy approved this plan.

173.    On October 16, 2020, Ms. Boyle pointed out to Warden Miles that the OEIG investigation was ongoing. Warden Miles had not known about that investigation, and ordered Ms. Boyle to stay in the Administrative Building.

174.    Siegfried requested a medical leave of absence effective December 24, 2020.

22

175.    After Siegfried went on medical leave, Ms. Boyle returned to the Academic Building, though she still felt marginalized and humiliated by IDOC.

176.    On December 27, 2020, Ms. Boyle wrote a letter to Warden Miles and Assistant Warden Duffield describing the assault and sexual harassment she had endured from Siegfried, and her ongoing emotional distress for which she was receiving counseling. She complained about IDOC's revocation of her approved Benefit Time and its preferential treatment of Siegfried. Ms. Boyle also reported that she was not being kept up to date about monthly department meetings and staff trainings.

177.    Warden Miles sought guidance from Director Hardy on how to respond to Ms. Boyle's complaint about discrimination, sexual harassment, and retaliation.

178.    On January 7, 2021, Warden Miles claimed that Ms. Boyle had "inadvertently been given a credit for sick days" that did not actually meet the criteria for transfer to state employment. She instructed Assistant Warden Duffield to notify Ms. Boyle about trainings and meetings, but did not otherwise address Ms. Boyle's concerns.

179.    IDOC offered no reasonable accommodation to Ms. Boyle even though it was on notice of her emotional distress and counseling.

180.    IDOC did not investigate Ms. Boyle's claims of discrimination and retaliation after receiving her letter of December 27, 2020.

**The OEIG investigates Ms. Boyle's claims and learns that Siegfried harassed another female employee.**

181.    Throughout 2020 and 2021, the OEIG investigated Ms. Boyle's reports of sexual harassment and retaliation. The OEIG interviewed dozens of witnesses and subpoenaed documents and electronically stored information.

182.   During that investigation, the OEIG interviewed Ms. Heelan about her experience with Siegfried when he was her supervisor during her temporary assignment.

183.   Ms. Heelan reported that she wanted to quit her first week of the assignment because Siegfried made her "really uncomfortable" and she "dreaded going into work."

184.   Ms. Heelan reported that Siegfried made unsolicited and unwelcome overtures to her that she vocally rejected.

185.   Ms. Heelan alleged that Siegfried, unprompted, told her racy rumors about other employees; gave her his personal phone number; made her coffee; offered to bend IDOC policy to give her favored treatment; nicknamed her; showed up unannounced in the library with no warning; tried to distract her from her work; tried to have her do his work; demanded that she take her breaks at certain times; and twice offered her Starbucks gift cards for going "above and beyond."

186.   A few weeks after she started her assignment, Siegfried called Ms. Heelan to his office solely to discuss her personal relationship with Steve Fanti, a corrections officer at Sheridan and the president of the local union. Siegfried said he could not understand how Ms. Heelan and Mr. Fanti were together because of how "different" they were. He proceeded to name Mr. Fanti's perceived flaws. Siegfried then commented on Heelan's "perfect body" and said how she was in the "best shape," didn't need to "lose any weight," and was in "better shape than everyone at the facility."

187.   In the Spring of 2020, Ms. Heelan wrote an incident report about the comments Siegfried had made toward her and his "creepy" behavior and gave it to her union representative. A union steward told Siegfried that he was making an employee uncomfortable but that failed to cause Siegfried to change behavior.

188.     Ms. Heelan also reported that many employees at Sheridan had observed that Ms. Boyle and Siegfried were "connected at the hip" and it was widely assumed they were having an affair.

**The OEIG finds Siegfried violated state policy and sexually harassed Ms. Boyle, and IDOC should have opened a formal investigation into Ms. Boyle's complaint.**

189.     On or about January 28, 2022, the OEIG issued a report finding reasonable cause that "Jeffrey Siegfried engaged in conduct unbecoming with respect to his treatment of and conduct towards both Victoria Boyle and Heather Heelan, in violation of IDOC's Rules of Conduct and State policy."

190.     The OEIG recommended "that IDOC continue to ensure its processes for deciding whether to open an internal investigation into a harassment complaint do not rest solely on whether third-party witnesses exist at the time that decision is made, which appears to have been the case with the Office of Affirmative Action's handling of Ms. Boyle's complaint."

191.     The OEIG found that Ms. Boyle's 93.5 sick days had actually never been revoked by the Illinois Department of Central Management Services ("CMS"), the benefits administrator for all State of Illinois agencies.

192.     On February 7, 2022, IDOC moved to terminate Siegfried's employment based on the charge that he violated Administrative Directive 03.02.108, Standards of Conduct.

193.     IDOC held a disciplinary hearing on March 18, 2022, where it was determined:

[Siegfried] engaged in conduct unbecoming of a State employee, especially one with supervisory duties. Mr. Siegfried engaged in a pattern of inappropriate behavior by fostering or attempting to foster personal relationships with female subordinates through extensive communication efforts outside of working hours, providing gifts beyond acceptable norms, and discussing personnel issues with subordinates not related to those subordinates' job duties. This is in violation of A.D. 03.02.108, Standard of Conduct; IDOC Rules Part 120 and Employee Handbook Rules of Conduct.

194.     Siegfried's termination was effective on May 31, 2022.

195.     After the OEIG's report, IDOC told Ms. Boyle that CMS had revoked her 93.5 sick days.

196.     Had IDOC not revoked her Benefit Time, Ms. Boyle could have taken the 30-day leave of absence in April 2020 to recover from Siegfried's sexual harassment fully paid.

## COUNT I
### Sexual Harassment in Violation of Title VII
### 42 U.S.C. § 2000*e*-2(a)

197.     Plaintiff re-pleads the allegations contained in the preceding paragraphs of this complaint and incorporates them by reference as if fully set forth herein.

198.     Title VII prohibits harassment on the basis of sex. 42 U.S.C. § 2000*e*-2(a)(1).

199.     Plaintiff is a member of a protected class on the basis of her female sex.

200.     At all relevant times, Defendant was an "employer" within the meaning of 42 U.S.C. § 2000*e*(b) and Siegfried and Plaintiff were "persons" within the meaning of 42 U.S.C. § 2000*e*(a).

201.     Under Title VII, an employer is liable for a supervisor's sexual harassment of an employee.

202.     At all relevant times, Siegfried was Defendant's employee and Plaintiff's supervisor within the meaning of Title VII.

203.     Defendant is liable under Title VII for Siegfried's sexual harassment of Plaintiff.

204.     Defendant failed to properly train Siegfried to not sexually harass employees and to maintain appropriate boundaries with subordinates when he became a supervisor.

205.      At all relevant times, Siegfried's actions toward Plaintiff were taken in the scope of his employment.

206. Siegfried's different treatment of Plaintiff was widely known at Sheridan. Defendant should have known and protected Plaintiff from his inappropriate, discriminatory behavior.

207. Because of Defendant's inaction, Siegfried was allowed to operate unfettered.

208. Siegfried made repeated unwanted sexual advances and unwelcome romantic overtures to Plaintiff that were implicitly a term and condition of her employment and created an intimidating, hostile, and offensive working environment.

209. Siegfried's persistent sexual harassment of Plaintiff included unsolicited and unwelcome physical touches, comments on her appearance, invitations to take overnight trips with him, invitations to dates, emotional manipulation, demands that she be "all in" and say that she "loves" him, demands that she listen to him, demands that she perform his duties, frequent communication outside of working hours, demands that she discuss her personal life, and demands that she let him hold her hands.

210. In mid-April 2020, at Sheridan, Siegfried sexually harassed Plaintiff by demanding that she go into a closet and engage in sexual acts with him. He sexually harassed her by locking her in a computer lab with him alone, twice, and demanding multiple times that they have sex in the closet.

211. Plaintiff's refusal to submit to Siegfried's demands for sexual favors resulted in Siegfried changing her duties, consigning her to her classroom, barring her from common areas, and threatening her personal safety, to rape her, to subject her to assault by adult male prisoners, and to terminate her employment.

212. Siegfried's harassment was unwelcome, Plaintiff rejected his advances, and she complained to him about his sexual harassment, discrimination, and retaliation toward her.

27

213.    Siegfried knew or should have known of the obligations and duties of Title VII.

214.    Siegfried, with malicious and reckless disregard of Plaintiff's rights under Title VII, created an abusive working environment, predicated her employment on submission to his demands, battered her, threatened to rape her and to let her be assaulted by adult male inmates.

215.    Siegfried's persistent sexual harassment and his threatened sexual assault of Plaintiff caused emotional distress, pain and suffering, lost wages, and anguish.

216.    Although Defendant knew of Siegfried's sexual harassment of Plaintiff because she reported it, Defendant failed to take any actual corrective action against Siegfried for nearly two years.

217.    By letting Siegfried to stay in his position, Defendant enabled Siegfried to sexually harass at least one other female employee, Ms. Heelan.

218.    Defendant knew or should have known that having Siegfried sign a notice about the Administrative Directive prohibiting sexual harassment would not prevent him from sexually harassing other employees or protect Plaintiff from him.

219.    Defendant knew or should have known of its obligations under Title VII.

220.    Defendant, with malicious and reckless disregard, allowed Siegfried's severe and pervasive harassment to continue, creating an abusive and dangerous working environment.

221.    As a result of Defendant's violations of Title VII, Plaintiff has suffered damages, including lost wages, lost Benefit Time, emotional distress, pain and suffering, and anguish.

**COUNT II**
**Sex Discrimination in Violation of Title VII**
**<u>42 U.S.C. § 2000<i>e</i>-2(a)</u>**

222.    Plaintiff re-pleads the allegations contained in the preceding paragraphs of this complaint and incorporates them by reference as if fully set forth herein.

28

223.    Title VII prohibits employers from discriminating against their employees with respect to terms, conditions, benefits, or privileges of employment based on sex. 42 U.S.C. § 2000*e*-2(a).

224.    At all relevant times, Plaintiff was an "employee" and Defendant was an "employer" within the meaning of Title VII. 42 U.S.C. § 2000*e*(b).

225.    At all relevant times, Siegfried was Defendant's employee and Plaintiff's supervisor.

226.    Defendant is liable for Siegfried's discriminatory conduct toward Plaintiff.

227.    Siegfried daily exercised direct and immediate discretionary control over Plaintiff's conduct, work schedule, duties, and performance of duties.

228.    Siegfried treated Plaintiff differently than other educators he supervised because of her sex.

229.    Siegfried demanded that Plaintiff meet him every morning in the Sheridan parking lot and walk in to work together.

230.    Siegfried texted her frequently outside of work, often about personal matters.

231.    Siegfried isolated Plaintiff from her coworkers.

232.    Siegfried made Plaintiff listen to his stories and life advice.

233.    Siegfried made Plaintiff perform his duties.

234.    Siegfried closely controlled when Plaintiff could perform her duties.

235.    Siegfried interfered with Plaintiff's ability to perform her duties.

236.    Siegfried made repeated unwanted sexual advances and unwelcome romantic overtures.

237. Siegfried restricted Plaintiff's access to the common office, impacting her ability to perform her duties, when she refused to submit to his demands for a sexual relationship.

238. Siegfried's actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff's federally protected rights.

239. Siegfried's different treatment of Plaintiff was widely known at Sheridan.

240. Siegfried's discriminatory treatment of Plaintiff caused her emotional distress, paint and suffering, and anguish that required her to miss work and receive counseling.

241. Defendant had a duty under Title VII not to treat Plaintiff differently based on her sex with respect to the terms and conditions of her employment.

242. Defendant treated Plaintiff differently and worse than other educators because of her sex.

243. Defendant treated Plaintiff differently and worse than it treated Siegfried, because Siegfried is male and Plaintiff is female.

244. Defendant did not discipline Siegfried in any way for nearly two years. Had the OEIG not investigated Plaintiff's complaint, Siegfried would still be employed at Defendant.

245. By refusing to open a formal investigation into Plaintiff's report of sexual harassment and sex discrimination, Defendant failed to follow state protocol, *i.e.*, the Office of the Governor's guidance on investigating claims of sexual harassment.

246. Defendant violated state protocol because of discriminatory animus against women, particularly women who complain about sexual harassment.

247. Defendant kept Siegfried in his position as EFA and removed Plaintiff from her duties, thereby failing to follow its own Administrative Directive and interfering with Plaintiff's ability to perform her educator duties for several months.

248. Defendant did not interfere with Siegfried's abilities to perform his duties.

249. When Defendant returned Plaintiff to educator duties, they kept her segregated from other educators and failed to keep her apprised of trainings and meetings.

250. Defendant could have reassigned Siegfried and/or moved Siegfried to another building to perform his duties.

251. When Plaintiff complained about discriminatory treatment and retaliation on December 27, 2020, Defendant brushed off her concerns.

252. Defendant's actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff's federally protected rights under Title VII.

253. Defendant's violations of Title VII caused Plaintiff emotional distress, pain and suffering, and anguish that required her to miss work, seek and receive counseling.

### COUNT III
### Retaliation in Violation of Title VII
### 42 U.S.C. § 2000*e*-3(a)

254. Plaintiff re-pleads the allegations contained in the preceding paragraphs of this complaint and incorporates them by reference as if fully set forth herein.

255. Title VII prohibits employers from retaliating against their employees for reporting discriminatory conduct and making good faith complaints of sex discrimination and harassment. 42 U.S.C. § 2000*e*-3(a).

256. Plaintiff opposed Siegfried's discriminatory and harassing behavior, which she reasonably believed violated her rights under Title VII.

257. Plaintiff refused to engage in sexual activity with Siegfried on or about April 13, 2020, and again on April 15, 2020, and complained to him about his making sexual demands of her and treating her differently from her coworkers.

258.     Siegfried retaliated by changing Plaintiff's duties, ordering her to stay in her classroom, banning her from the communal office, interfering with her duties, threatening to write her up for cleaning her classroom, threatening to terminate her employment, threatening to let inmates "do things to her," threatening to "force her into a closet and rape her," and otherwise threatening her personal safety.

259.     On information and belief, after she refused to have sex with him, Siegfried told Sheridan's HR department that Plaintiff's Benefit Time should not have been carried over from her previous employer. Siegfried had previously claimed he could squash any inquiries into her Benefit Time.

260.     In good faith, Plaintiff reported Siegfried's sexual harassment, discrimination, and retaliation toward her to Defendant on April 20, 2020, which she reasonably believed violated her rights under Title VII.

261.     That same day, Defendant removed Plaintiff from her educator duties and reassigned her to the mail room in the Administrative Building. Siegfried was allowed to stay in his position as the EFA in the Academic Building and he was not disciplined.

262.     With retaliatory animus, Defendant ignored its Administrative Directive requiring that the alleged perpetrator be removed from the work site, not the alleged victim.

263.     Plaintiff suffered the humiliation of being demoted to a position where she had to open and sort pornographic mail while the man who had harassed her was allowed to stay in his position with no consequences.

264.     With retaliatory animus, Defendant refused to open a formal investigation into Plaintiff's report of sexual harassment and sex discrimination.

32

265. Defendant did not return Plaintiff to the Academic Building and her educator duties for several months. When Plaintiff was allowed to return to her educator duties, she was left out of trainings and meetings that other educators could attend.

266. The temporal proximity of Plaintiff's reporting sexual harassment and Defendant's removing her from her educator duties—the same day—shows Defendant's retaliatory intent.

267. One week after she reported Siegfried's sexual harassment, sex discrimination, and retaliation to Defendant, Defendant revoked Plaintiff's approved Benefit Time.

268. The temporal proximity of Plaintiff's report and the loss of her approved Benefit Time – one week – shows Defendant's retaliatory intent.

269. Because of this, Plaintiff lost wages since she could not work in the immediate aftermath of Siegfried's assault. She could not take an extended time off to recover from Siegfried's assault because Defendant revoked her Benefit Time.

270. Plaintiff put Defendant on notice of her ongoing emotional distress and Defendant offered her no accommodation.

271. Plaintiff sought a hardship transfer and was denied.

272. Defendant refused Plaintiff's request to have her shift changed by one hour to avoid Siegfried.

273. Plaintiff made a good-faith complaint alleging ongoing discrimination and retaliation to Defendant on or about December 27, 2020, which was largely ignored. Defendant did not investigate Plaintiff's allegations of discrimination and retaliation.

274. Defendant's failure to address her complaints caused Plaintiff additional emotional distress.

275.    Defendant knew or should have known about its obligations and duties under Title VII.

276.    Defendant violated Plaintiff's rights under Title VII by retaliating against her for opposing sex discrimination, sexual harassment, and retaliation.

277.    Plaintiff has suffered and continues to suffer damages as a result of Defendant's violations of Title VII.

278.    Plaintiff has suffered emotional distress, lost benefit time, lost wages, pain and suffering, and loss of professional standing because of Defendant's actions.

### PRAYER FOR RELIEF

279.    WHEREFORE, Plaintiff Victoria S. Boyle requests that this Court enter an Order:

a.    Finding that Defendant sexually harassed Plaintiff in violation of Title VII;

b.    Finding that Defendant discriminated against Plaintiff on the basis of sex in violation of Title VII;

c.    Finding that Defendant retaliated against Plaintiff for opposing sexual harassment, sex discrimination, and retaliation, in violation of Title VII;

d.    Making Plaintiff whole by an appropriate award of monetary damages resulting from Defendant's conduct, including compensatory damages, actual damages, pre-judgment interest, attorneys' fees, and litigation expenses;

e.    Finding that Defendant's conduct was malicious, willful, and taken with reckless indifference to Plaintiff's federally protected rights, and awarding exemplary damages; and

f.    Awarding Plaintiff all other relief as the Court deems just and equitable.

## JURY DEMAND

280.    Plaintiff demands a trial by jury of all issues raised in this Complaint.

Dated: October 21, 2022                          Respectfully submitted,

                                                 VICTORIA S. BOYLE

                                                 By:   /s/      Laura Lefkow-Hynes
                                                       One of Plaintiff's Attorneys

The Prinz Law Firm, P.C.
Amit Bindra (abindra@prinz-lawfirm.com)
Laura Lefkow-Hynes (llefkowhynes@prinz-lawfirm.com)
One East Wacker Drive, Suite 1800
Chicago, Illinois 60601
Tel. (312) 212-4450
Fax (312) 284-4822